1
2
3
4
5
6
7
8                   UNITED STATES DISTRICT COURT
9                  SOUTHERN DISTRICT OF CALIFORNIA
10
11  STEPHEN BOYLE,                        Case No.:  3:16-cv-0469-BAS-PCL
12                           Plaintiff,
                                          **REPORT AND RECOMMENDATION**
13  v.                                    **OF U.S. MAGISTRATE JUDGE RE:**
14  SCOTT KERNAN, Secretary,
                                          **FIRST AMENDED PETITION FOR**
15                          Defendant.    **WRIT OF HABEAS CORPUS**
16
17
18                            **I. INTRODUCTION**

19        On March 2, 2017, Petitioner Stephen Boyle ("Petitioner"), proceeding *pro se* and

20  *in forma pauperis*, filed a First Amended Petition ("FAP") seeking a writ of habeas

21  corpus pursuant to 28 U.S.C. § 2254. (Doc. 1.) Petitioner claims a violation of *Brady v.*

22  *Maryland*, 373 U.S. 83 (1963) ("*Brady*"), various instances of prosecutorial misconduct,

23  ineffective assistance of appellate counsel, ineffective assistance of trial counsel, and an

24  error by the trial court denying Petitioner's motion to sever the charges according to the

25  victims denied Petitioner his right to a fair trial. (*Id*.; Doc. 32.)

26        The Honorable Cynthia A. Bashant referred the matter to the undersigned Judge

27  for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil

28  //

                                          1

Rule 72.1(c)(1)(d). After a thorough review of the petition, supplement, answer, exhibits, state court records, and state court decisions, the Court recommends DENYING RELIEF.

## II. FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28 U.S.C. §2254(e)(1); *see also Summer v. Mata*, 449 U.S. 539, 550 (1981) (holding in part that findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The following facts are taken from the California Court of Appeal opinion:

*A. The People's evidence*
    *1. Boyle's rape of Ashley (count 6)*
        In October 2008, Ashley lived next door to Greg Hall, the former president of a motorcycle club called the Gun Fighters. Ashley was friends with Hall and attended a Gun Fighters' Halloween party at his residence. Boyle, who had met Ashley on several previous occasions, attended the party as well. At that time, Boyle was a prospective member of the Gun Fighters. Boyle and Ashley flirted with each other during the party, and, at one point, Boyle kissed Ashley. Shortly thereafter, someone at the party told Ashley that Boyle was married. After learning Boyle's marital status, Ashley was no longer interested in him and stayed away from Boyle throughout the remainder of the party.

        After leaving the party, Ashley went next door to her residence, went into her bedroom, locked her bedroom door, put on some pajamas, and went to sleep. [FN4. Ashley explained that she locked her bedroom door because she and her roommates had an "'open door policy'" and many people were going back and forth between the party at Hall's residence and her residence.] After falling asleep, Ashley heard a knock on her bedroom door. She then heard Boyle asking her to open the door. Ashley ignored the knock, thinking that he would go away. About 20 minutes later, Boyle knocked again, and this time asked her in a louder voice to open her door. Ashley opened the door and Boyle walked into her bedroom. Ashley told Boyle that she was going to bed, but Boyle took another step inside the room, forcefully pushed Ashley against the wall, closed the door and locked it.

        Boyle picked up Ashley by her armpits and threw her onto the bed. Boyle then pulled off Ashley's pajama pants, put his arm across her chest,

2

and held her shoulder down. Boyle proceeded to rape Ashley for approximately two to five minutes. After the rape, Boyle told Ashley not to tell anyone, and added that he was "not somebody to be reckoned with," and that "his brothers would have his back." These threats frightened Ashley, particularly because she knew that Boyle had a criminal history.

*2. Boyle's rape of Luz P. (propensity evidence)*

On the evening of May 22, 2010, Luz P. (Luz) and some friends went to a bar in Tombstone, Arizona. Boyle, who was also at the bar, met Luz, and the two danced. At approximately 9:00 p.m., Luz and her friends left and went to a second bar. Boyle met up with Luz at the second bar and again began talking with Luz and one of her friends. At approximately 1:00 a.m., Luz and her friends decided to leave the second bar.

While Luz's friends were paying their bill, Boyle asked Luz to come outside with him to look at his motorcycle. Luz agreed. As soon as Boyle and Luz were outside the bar, Boyle forcefully grabbed Luz's hand and led her away from the bar. Boyle forced Luz to walk with him to a dark and solitary area, telling her, "Shut up bitch. Keep walking." [FN5. Boyle weighed about 240 to 260 pounds. Luz was four feet nine inches, weighed 100 pounds, and had a prosthetic leg.]

Boyle eventually stopped walking and yelled, "Bitch, pull your pants down." Boyle then forced Luz to take her pants down. Boyle got on top of Luz and held her down. While Boyle was on top of Luz her cellular phone fell. Boyle grabbed the phone and threw it into a nearby trash can. As Boyle attacked Luz, she begged him to stop and told him "no" several times. Luz thought that Boyle might kill her. Boyle forced Luz to orally copulate him and raped her.

*3. Boyle's sexual assault of Rachel (counts 1-5)*

Rachel, her husband, Kevin, and another couple that they were friendly with, attended an overnight camping party held by the Grifters Motorcycle Club [FN6. The Grifters were formerly known as the Gun Fighters.] in a remote area of Warner Springs on Saturday, September 24, 2011. Rachel and Kevin had been socializing with the Grifters for a couple of months before the party because Kevin was considering joining the club. Rachel had met Boyle on approximately two occasions prior to the party. At the time of the party, Boyle was president of the South County chapter of the Grifters.

During the party, Boyle told Rachel that he needed to talk with her about something. Rachel thought that Boyle wanted to talk about Kevin. Boyle led Rachel away from the main party to an area where a number of motorcycles were parked. Boyle began showing Rachel his motorcycle. Boyle told Rachel that the seat on his motorcycle was comfortable, tapped

the seat, and told her to "test it out." Rachel got on the seat. Boyle then got on the motorcycle and drove off with Rachel on the back of the motorcycle. They had never discussed leaving the party and Rachel did not want to go anywhere with Boyle.

As Boyle rode off, Rachel yelled at him to take her back to the party and hit him in the back with both of her hands. At one point during the ride, Boyle reached around and tried to put his hand down Rachel's tights. Boyle pulled off onto a remote gravel road and angrily told Rachel to get off the motorcycle. Boyle put his hand around Rachel's neck and shoulder and forcefully pushed her over the motorcycle so that her stomach was on the seat. Boyle orally copulated Rachel despite her pleas to stop. Boyle tried to penetrate Rachel's vagina with his penis while she was bent over the motorcycle, but he was unable to do so because he was not sufficiently erect.

Boyle pushed Rachel to the ground hard and told her to "start sucking," which she refused to do. Boyle became angry and pulled out a knife that was approximately six inches long. Boyle told Rachel, "[I]f [you] [don't] start sucking . . . [this will] be the last dick [you] ever sucked" and started to rub the knife around Rachel's throat, face and hair. Rachel complied and orally copulated Boyle.

At one point during the encounter, an eyewitness, Kenneth Russell, drove by Rachel and Boyle. Russell saw Rachel orally copulating Boyle, but did not see a knife in Boyle's hands. Russell estimated that he saw Rachel and Boyle for approximately five seconds before driving off quickly when Boyle gave him a dirty look.

At some point during the oral copulation, Rachel stopped, but Boyle forced her to continue. At another point, Boyle forced Rachel to the ground and stuck his finger in her rectum. Rachel started to scream, which made Boyle angry. Boyle told Rachel to get up and "finish it." Rachel orally copulated Boyle again and he ejaculated in her mouth. Semen got on Rachel's face, tights, and hands.

After the assaults, Boyle told Rachel to get back on the motorcycle. Boyle told her that if anyone asked where they had gone, she should say that they just went for a ride to the lake. Boyle then drove the two back to the party. Immediately upon their return, Rachel disclosed the assaults to a friend, who drove her to the hospital and called 911. On the drive to the hospital, Rachel vomited and had a seizure. [FN7. Rachel suffers from epilepsy.] At the hospital, Rachel learned that she had vaginal bleeding and that there was gravel embedded in her arms.

In an office next to the hospital, Rachel underwent a sexual assault response team (SART) examination. Rachel had dirt on her hands and face, scratches on her arm, and redness around her cervix and anal opening. In

addition, Boyle's sperm was found in an oral swab taken from Rachel. Boyle's DNA was also found in an external genital swab taken from Rachel. Boyle's semen was found on Rachel's hands, face, and on her tights. In the hours after the assaults, law enforcement officers attempted to locate Boyle, but were unable to find him. Two days later, Boyle was arrested near the border between the United States and Mexico.

### B. The defense

Angela Miller used to date one of the Gun Fighters and attended their 2008 Halloween party. Miller stated that she saw Ashley after Boyle had left the Halloween party and that Ashley did not seem upset nor did she appear to have been crying. Miller also saw Ashely hug Boyle at social gatherings that occurred after the Halloween party. Ronald Hayes was one of Ashley's roommates in October 2008. Hayes remembered parts of the evening of the Halloween party, but he was drunk that night and was also on drugs. Hayes did not hear Ashley call out for help, and would have assisted if he had heard her calling for help.

Andrew Ritz saw Boyle and Luz walking together after the alleged rape in May 2010. Boyle and Luz were holding hands and laughing.

(Lodgment 1, 4-9.)

## III. PROCEDURAL BACKGROUND

The San Diego District Attorney ("Prosecution") filed the first complaint against Petitioner on September 29, 2011, which included five felony charges. (Lodgment 16 at 1.) This complaint charged: (1) forcible rape (Cal. Pen. Code § 261(a)(2)), (2) forcible oral copulation (Cal. Pen Code § 288a(c)(2)(A)), a second count of (3) forcible oral copulation (*id*.), (4) rape by foreign object – use of force (Cal. Pen. Code § 289(a)(1)(A)), and another count of (5) forcible oral copulation (Cal. Pen. Code § 288a(c)(2)(A)). (Id. at 2.)

On June 18, 2012, Petitioner was arraigned for the charge filed regarding the Ashley H. incident. (Id. at 162.) The Ashley H. charge was consolidated with the Rachel O. charges pursuant to the Prosecution's motion to consolidate filed on July 26, 2012. (Lodgment 1 at 63-70.) Accordingly, a consolidated amended information filed by the Prosecution on July 26, 2012 included the allegations with factual support. (Id. at 23.)

The consolidated amended information included six charges: (1) forcible oral copulation, including a kidnapping enhancement and a multiple victim enhancement (Cal. Pen Code § 288a(c)(2)(A), § 667(d)(2), § 667.61 (b)(c)(e)); (2) forcible oral copulation, including kidnapping, use of a deadly weapon, and multiple victim enhancements (Cal. Pen Code § 288a(c)(2)(A), § 12022.3(a), § 667.61(d)(2), § 667.61(b)(c)(e)); (3)  assault with intent to commit a specific felony (Cal. Pen. Code § 220 (a)(1)); (4) rape by foreign object – use of force, including kidnapping and multiple victim enhancements (Cal. Pen. Code § 289 (a)(1)(A), § 667(d)(2), § 667.61 (b)(c)(e)); (5) forcible oral copulation, including kidnapping and multiple victim enhancements (Cal. Pen Code § 288a(c)(2)(A), § 667(d)(2), § 667.61 (b)(c)(e)); and (6) forcible rape, including burglary and multiple victim enhancements (Cal. Pen. Code § 261(a)(2), § 667(a)(c)(d), § 667.61 (b)(c)(e)). Charges one through five relate to the 2011 incident involving Rachel O. whereas charge six relates to the 2008 incident involving Ashley H.

Petitioner's trial began on October 23, 2012 and the matter was submitted to the jury on November 1, 2012. (*Id*. at 429.) After less than 90 minutes, the jurors informed the court they had reached a unanimous verdict. (*Id*.) Petitioner was found guilty by the jury on all charges and sentenced to 263 years in prison. (*Id*. at 430, Lodgment 20 at 1920-21.)

After being sentenced, Petitioner filed his first appeal as of right in the California Court of Appeal. (*See* Lodgments 2, 13-14.) Therein, Petitioner argued the trial court erred "in refusing to grant a mistrial and denying [Petitioner]'s new trial motion based on the [P]rosecution's *Brady* violation, and compound[ing] that error by failing to correctly instruct the jury" and "in refusing to sever the cases." (Lodgment 3 at 53.) Respondent denied the existence of a *Brady* violation during the trial, and contended the trial court properly denied the motion to sever the Ashley H. count from the Rachel O. counts. (Lodgment 13 at 13, 26.) The Court of Appeal affirmed the judgment of the trial court. (Lodgment 1 at 3.)

//

On October 27, 2014,[1] Petitioner filed his petition for review in the Supreme Court of California. (Lodgment 3.) Petitioner there raised the same two issues: the *Brady* issue and the denial of the motion to sever the Ashley H. count from the Rachel O. counts. (*Id.* at 6, 19.)  The Supreme Court summarily denied Petitioner's request for review on December 3, 2014. (Lodgment 4.)

After Petitioner's direct appeal became final, Petitioner filed a motion for DNA testing of the scrapings taken from Rachel O.'s fingernails. (Lodgment 9 at 24.) On July 8, 2015, his motion was filed in the Superior Court of Vista. (*Id.* at 22.) The Superior Court granted the motion and granted Petitioner's request for appointed counsel to assist in the proceeding. (*Id.*) There is no indication in the record whether this testing was actually completed, or what the results revealed.

On January 26, 2016,[2] Petitioner filed his petition for writ of habeas corpus in the Superior Court. (Lodgment 5.) Petitioner advanced four arguments therein. First, Petitioner argued there was a *Brady* violation in connection with a toxicology report. (Lodgment 5 at 15.) Second, Petitioner argued there was a pattern of prosecutorial misconduct throughout the trial, comprised of the *Brady* violation enumerated above and alleged perjured testimony. (*Id.* at 33.) Third, Petitioner continued forward with the argument that the trial court erred in denying his motion to sever the Ashley H. charge from the Rachel O. charges. (*Id.* at 54.) Fourth and finally, Petitioner argues he received ineffective assistance of counsel because his trial attorney failed to investigate and test evidence that was available. (*Id.* at 69.) The Superior Court found Petitioner "failed to make a prima facie showing of specific facts which would entitle him to habeas corpus relief under existing law." (Lodgment 6 at 3.)

---

[1] Lodgment 3 does not have a file stamp from the Supreme Court of California. Instead, this date reflects the date the petition for review was signed by counsel.

[2] Petitioner notes in his petition for writ of habeas corpus submitted to the Supreme Court of California (Lodgment 9) that his writ submitted to the Superior Court was received by that court on November 30, 2015. Petitioner, however, does not provide any documentation to show where this information was derived from. Thus, this Court defers to the docketing date of the writ.

After Petitioner filed his first petition for writ of habeas corpus in the Superior Court, Petitioner filed a petition for writ of habeas corpus in this Court on February 16, 2016. (Doc. 1.) Accompanying his petition was a motion to stay. (*Id*.) This Court adopted the report and recommendation filed recommending a denial of Petitioner's motion to stay based on the lack of "good cause" for the delay the filing of Petitioner's writ of habeas corpus in the Superior Court. (Doc. 16 at 5.) Petitioner gave notice of appeal to the Ninth Circuit regarding this order on October 19, 2016. (Doc. 22.) However, on October 11, 2017, the Ninth Circuit ruled Petitioner was unable to appeal this order because the collateral order doctrine does not apply. (Doc. 54 at 1.) Petitioner attempted to obtain a Certificate of Appealability from the District Court on this matter (Doc. 23), but this Court denied Petitioner's motion for such. (Doc. 25.)

On May 17, 2016, about two months after the Superior Court denied Petitioner's writ, Petitioner filed a rebuttal to the Superior Court's decision. (Lodgment 11.) In his rebuttal, Petitioner amended his argument of prosecutorial misconduct to a claim for ineffective assistance of appellate counsel for not raising the issue of prosecutorial misconduct. (*Id*. at 39) Other than this amended argument, however, the rebuttal was almost identical to the original writ. (Lodgment 12 at 1-2.) The Superior Court again denied Petitioner's request for habeas relief. (*Id*. at 2.)

Following this second denial at the Superior Court level, Petitioner filed a petition for writ of habeas corpus in the Court of Appeal on August 5, 2016. (Lodgment 7.) Therein, Petitioner advanced similar arguments as those he previously raised in his Superior Court writ. First, Petitioner argued the trial court erred in not granting a mistrial after a *Brady* violation occurred. (*Id*.) Second, Petitioner argued he received ineffective assistance of appellate counsel for not raising prosecutorial misconduct during his direct appeal. (*Id*.) Third, Petitioner raised the issue of his motion to sever, and argued the trial court erred in denying the motion thereby allowing the cases to be consolidated and the

//

//

Luz P. case also be included.[3] (*Id.*) There, Petitioner presented new evidence, including Luz P.'s police interview which included discrepancies from her trial testimony and the S.A.R.T. report indicating Luz P. had no neck injuries from the incident nor any semen inside of her, which contradicts her testimony. (*Id.*) Fourth and finally, Petitioner argued he received ineffective assistance of counsel from his trial counsel. (*Id.*) Petitioner points to his trial counsel's alleged failure to investigate and test available evidence, his failure to present alibi witnesses at trial, and his failure to effectively prepare for trial as specific deficiencies. (*Id.*) Petitioner also sought an evidentiary hearing regarding the DNA evidence procured from the scrapings of Rachel O.'s fingernails.

The Court of Appeal first denied Petitioner's writ as untimely. (Lodgment 8 at 2.) In the same opinion, though, the Court of Appeal continued to briefly discuss the merits of the new claims raised in Petitioner's writ. (*Id.*) The Court of Appeal held that "even if the new claims of ineffective assistance of counsel were not time-barred, they would be denied on the merits." (*Id.*) Additionally, the Court of Appeal found that a writ for habeas corpus was not the appropriate way for Petitioner to seek an evidentiary hearing given the statutory procedure available for postconviction DNA testing. (*Id.* at 3, (citing Cal. Pen. Code § 1405).)

Following the Court of Appeal's denial of Petitioner's petition, Petitioner filed a petition for writ of habeas corpus in the Supreme Court of California on December 19, 2016. (Lodgment 9.) Petitioner raised four arguments in this petition. First, Petitioner raised the *Brady* violation argued in previous appeals and writs. Second, Petitioner argued he received constitutionally ineffective assistance of appellate counsel for failure to raise prosecutorial misconduct claims. In support of this claim, Petitioner submitted a

---

[3] The Court notes this is not necessarily a legitimate argument, and was likely based on a misunderstanding of the law by Petitioner. Here Petitioner was likely trying to add the introduction of the Luz P. case into his overall argument that severance was necessary. The Luz P. case was never subject to severance because it was not a charge in Petitioner's case, but rather used as propensity evidence only. However, the Court notes this argument because Petitioner uses the expansion of the argument to submit the additional evidence to rebut the Luz P. evidence. (Lodgment 7 at 68.)

letter from appellate counsel regarding the decision to not raise prosecutorial misconduct. Third, Petitioner raises the severance issue raised in previous appeals and writs. Lastly, Petitioner argued he received constitutionally ineffective assistance of trial counsel for failure to test evidence, failure to subpoena two alibi witnesses, and failure to consult with Petitioner in preparation for trial. On February 22, 2017, the Supreme Court of California summarily denied Petitioner's petition for writ of habeas corpus. (Lodgment 10.)

On March 2, 2017, Petitioner filed his FAP in this Court. (Doc. 29.) Petitioner's FAP included arguments for: (1) the previously described *Brady* violation, (2) prosecutorial misconduct, and (3) the severance issue previously described. (*Id*. at 37, 60, 70.) Two weeks later, on March 16, 2017, Petitioner filed a supplement to his petition, adding: (4) ineffective assistance of appellate counsel for failure to raise prosecutorial misconduct claim and (5) ineffective assistance of trial counsel. (Doc. 32 at 6, 24.) As in his petition for writ of habeas corpus submitted to the Supreme Court of California, Petitioner attached the letter from appellate counsel as new evidence in support of his fourth argument. (*Id*. at 47.)

Respondent filed an answer to the petition on June 5, 2017. (Doc. 39.) Petitioner then retained counsel, (Doc. 45), and filed his traverse on October 16, 2017, (Doc. 57), and his points and authorities in support thereof on October 27, 2017 through such counsel (Doc. 60). This petition is now before this Court.

## IV. SCOPE OF REVIEW

A federal court "shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of state court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §2254(a). Federal habeas courts may not "reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S.

74, 76 (2005); *see Park v. California*, 202 F.3d 1146, 1149-50 (9th Cir. 2000) ("a violation of state law standing alone is not cognizable in federal court on habeas").

This FAP is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. §2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinary deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877(9th Cir. 2004). Because Petitioner's arguments involve only questions of law, this Court reviews the petition under the "contrary to" and "unreasonable application" clauses of § 2254(d)(1).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

//

11

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Y1st v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Hines v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id*., the state court decision will not be "contrary to" clearly established federal law. *Id*. Clearly established federal law, for purposes of §2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

Where the state court did not reach the merits of a claim because of the imposition of a state procedural bar, "there is no state court decision. . . . to which to accord deference." *Pirtle*, 313 F.3d at 1167. Thus, this court must review those claims de novo. *Id*. However, AEDPA "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 562 U.S 86, 100 (2011). "Rather, [as the Supreme Court has] explained, '[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.'" *Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013) (quoting *Richter*, 562 U.S. at 99).

## V. DISCUSSION

In bringing this petition, Petitioner argues five claims warrant this Court granting habeas relief. (Doc. 29 at 6-8.) First, Petitioner argues a *Brady* violation occurred at his

trial. Second, several instances of prosecutorial misconduct are alleged by Petitioner. Third, Petitioner argues he received ineffective assistance of counsel from his appellate counsel for not arguing the previously mentioned prosecutorial misconduct. Fourth, Petitioner argues he also received ineffective assistance of counsel from his trial counsel for various reasons. Fifth and finally, Petitioner argues the trial court erred in denying his request to sever the Ashley H. count from the Rachel O. counts at the same trial. Petitioner contends all of these things resulted in a "deni[al of] his right to a fair trial, deni[al of his r]ight to [d]ue [p]rocess, . . . [and] a violat[ion of] Constitutional Amendments V, VI, [and] XIV. . . ." (Doc. 29 at 91.)

Respondent succinctly responds that none of Petitioner's arguments meet the high burden imposed upon petitioners for writs of habeas corpus. (Doc. 39-1 at 16.) According to Respondent, Petitioner's claims do not show a deficiency giving rise to habeas corpus relief because Petitioner's claims do not show the "'state court's ruling on the claim being presented . . . was so lacking in justification that there as an error well understood and comprehended in existing law beyond any possibility for fairminded agreement." (*Id.* (citing Harrington v. Richer, 562 U.S. 86, 100-02 (2011).)

## A. *Brady violation*

Petitioner's first argument is based on an alleged *Brady* violation which he argues deprived him of a fair trial. (Doc. 29 at 37.) On October 30, 2017, one week into Petitioner's trial, the Prosecution called criminalist Javier Peña to testify. Peña's testimony focuses solely on testing done to determine Rachel O.'s blood alcohol level on the night of the incident.[4] (Lodgment 15 at 806-817.) After being excused, Peña informed the Prosecution that further testing had been conducted on Rachel O.'s blood as well as her urine samples, neither of which had not been mentioned during Peña's testimony. (*Id.* at 870.) Once the Prosecution was informed of these toxicology results, the Prosecution

---

[4] Rachel O.'s blood alcohol concentration the night of the incident was 0.00%. (Lodgment 15 at 816-817.)

produced the urine test results to Petitioner, which showed the presence of hydrocodone in Rachel O.'s urine the night of the incident. (*Id*. at 867-8, 827. Lodgment 16 at 355-56.)

While the timeline of these toxicology test results is not presented completely by either Petitioner or Respondent in their respective briefs, the Clerk's Transcript provides the Court with a helpful recap of the various toxicology reports and the timeline of their discovery.

As a result of the incident with Rachel O., three toxicology tests were done by Bio-Tox Laboratories: one urine test and two blood tests. The urine test and one of the blood tests were done on April 27, 2012, months before Petitioner's trial commenced. (Lodgment 16 at 362, 366.) After the verdict was reached and Petitioner was convicted on November 1, 2012, and pursuant to Petitioner's defense counsel's request, the second blood test was performed and reported on December 5, 2012. (Id. at 289-294, 364.)

Before the trial commenced, the Prosecution had only produced toxicology regarding the test performed to determine the presence of alcohol in Rachel O.'s urine. (Lodgment 16 at 355.) At the time of the trial, however, there were also toxicology results for the blood test reported on April 27, 2012, which reported the presence of hydrocodone in Rachel O.'s blood. (*Id*. at 366.) This initial blood testing was not produced to Petitioner and his defense counsel until after the verdicts had been reached. (*Id*. at 356.) Ultimately, after Petitioner made an unsuccessful motion for mistrial based on Peña's notification to the Prosecution, Petitioner's defense counsel requested broader testing be conducted on Rachel O.'s blood sample. (*Id*. at 371.) Accordingly, such testing was conducted and showed the presence of carisprodol and meprobamate in Rachel O.'s blood. (*Id*. at 364.) The testing which had been completed at the time the trial began and the reports showing the results thereof are the basis for Petitioner's claim herein. (*Id*. at 362, 366.) The third report produced, in this Court's view, shows what Petitioner would have discovered and likely used in presenting his defense had the two other reports been properly produced, but does not fall within Petitioner's *Brady* claim. (*Id*. at 366.)

//

Defense counsel promptly motioned for a mistrial based on the late production of this evidence. (*Id*.) Defense counsel specifically argued the evidence had been clearly available to the Prosecution as it was procured by criminologists engaged by the Prosecution, but the Prosecution had not produced the reports to Petitioner prior to trial. Had Petitioner been apprised of these toxicology reports before trial, defense counsel argued he would have conducted his cross examination of Rachel O. and other witnesses differently because "[h]er credibility is the entirety of her case." (*Id*. at 868.)

The trial court denied Petitioner's motion for mistrial based on the alleged *Brady* violation finding there were no facts supporting the claim that the Prosecution withheld the reports. (*Id*. at 869.) The trial court based this finding on both parties' failure to follow up on the results of the toxicology tests. (*Id*. at 871.) After arriving at the hospital the night of the incident, Rachel O. underwent a S.A.R.T. exam, which included a S.A.R.T. nurse taking both blood and urine samples. The Prosecution informed the trial court that the District Attorney's Office generally requests both of these samples be tested in order to determine "whether there are any substances in the victim['s] . . . system." (*Id*.) Given both parties' awareness of the S.A.R.T. exam being conducted and the routine nature of these samples being taken, the trial court found both parties were equally at fault in failing to request the results in advance of trial. (*Id*. at 869.) In making such a finding of equal fault, the trial court denied Petitioner's claim there had been a *Brady* violation.

Instead of granting the mistrial, the trial court allowed both Rachel O. and Ola Bawardi, the toxicologist who analyzed the urine sample, to be recalled to testify regarding the newly discovered test results. (Lodgment 15 at 1437.) Rachel O. testified as to her prescriptions for various medications, including Vicodin[5] for pain, Keppra for seizures, Naproxen as a muscle relaxer, and Thorazpan for anxiety. (Lodgment 15 at 876,

---

[5] The trial court determined Vicodin and hydrocodone are the same drug. (Lodgment 15 at 1433.) When Vicodin is present in a blood or urine test, the test indicates the presence of hydrocodone. (Id. and 1455.)

1439-1442.) She also testified she believed she had taken all of the medications on day of the incident. (*Id*. at 1444-45.) During cross examination, Rachel O. testified she and her doctor had discussed the effects of mixing alcohol with her medications, and Rachel O. testified her doctor had advised against drinking heavily while on the drugs. (*Id*. at 1448.)

Bawardi testified as to the testing procedure at Bio-Tox Laboratories, where Rachel O.'s blood and urine samples were sent for toxicology tests. (*Id*. at 1450.) The testimony continued to discuss the hydrocodone found in the urine sample, but Bawardi testified that urine samples are "not really emphasized" because they can be easily skewed by hydration levels. (*Id*. at 1455.) Bawardi also testified about the effects Hydrocodone would have on a person.[6] (*Id*. at 1457.) During cross-examination, Bawardi testified that she did not test the urine in a way that any of Rachel O.'s other medications would have presented themselves. (*Id*. at 1462.) Additionally, Bawardi testified a blood test would be more useful in analyzing the level of hydrocodone and any other drugs in Rachel O.'s system. (*Id*.) However, Bawardi testified if Bio-Tox Laboratories had received a blood sample from Rachel O., it would have performed tests on the sample, but since no tests were conducted, Bawardi testified no blood sample had been received.[7] (*Id*. at 1467.)

In addition to recalling Rachel O. and Bawardi, the trial court took one additional step in an attempt to remedy the late production of the toxicology report. At the close of

//

//

_____

[6] Bawardi explained "Hydrocodone is a prescription medication that is used for pain." The drug has similar effects on a person as alcohol because both Hydrocodone and alcohol are central nervous system depressants. Specifically, "[hydrocodone] is designed to slow a person's mental abilities, their physical abilities . . . they may have slow thought processes, they may appear drowsy or fatigued. They may have some balance and coordination problems. But it is a depressant, so it can slow a person down mentally and physically." (Lodgment 15 at 1457.)

[7] This testimony led Petitioner, the jury, and the trial court to believe no blood tests had been performed. Contrarily, a blood test had been performed to determine the presence of amphetamines, cocaine, and opiates. (Lodgment 16 at 366.) This testing showed Rachel O. did in fact have hydrocodone in her blood. Bawardi had conducted this test. (*Id*.)

evidence, the trial court issued an additional jury instruction directly addressing this issue. This instruction was given over Petitioner's objection,[8] and read as follows:

> Both the Prosecution and the Defense did not learn about the results of the urine test that showed a positive test for hydrocodone until after Rachel O.'s original testimony in this trial. In your evaluation of the significance of this evidence, if any, you may consider the effect of the late discovery of the information.

(Lodgment 15 at 1592.)

Petitioner argues by assessing equal blame based on Petitioner's apparent opportunity to also discover the reports, the trial court engaged in a "misadventure." (Doc. 29 at 43.) In support of this, Petitioner cites numerous cases holding the prosecution has an affirmative duty to produce exculpatory or favorable evidence. Further, Petitioner argues the trial court's attempts to remedy the late production of the toxicology results were inadequate because Rachel O. and Bawardi's testimonies, combined with the jury instruction, were deficient in providing Petitioner a meaningful chance to understand the reports and present any alternative interpretations of the evidence. (Doc. 29 at 46-49.)

Respondent rebuts Petitioner's argument stating the Court of Appeal was correct in finding there was no *Brady* violation because the toxicology reports were not material. (Doc. 39-1 at 21.) The Court of Appeal found "[Petitioner]'s guilt did not depend on the jury's evaluation of whether Rachel [O.] was accurately perceiving and recalling subtle details of the night in question," because there was a substantial amount of evidence also supporting Rachel O.'s testimony. (Lodgment 1 at 24.) Thus, Respondent argues because the reports are not material, there could not have been a *Brady* violation in the late disclosure thereof.

//

---

[8] Defense counsel argued the instruction incorrectly assigned blame to both the Prosecution and defense and thus allowed the jury to improperly use the late production against Petitioner.

The Court of Appeal held both blood tests were immaterial under *Brady* because there was not a reasonable probability of a different result had the reports not been suppressed. (Lodgment 1 at 23.) The Court of Appeal further elaborated, "there is nothing in the record to suggest [the reports] rendered [Rachel O.'s] testimony that she was subjected to a series of forcible sexual offenses at knifepoint unreliable." (*Id*.) Petitioner's arguments were not found persuasive because although the prescriptions had not been discovered through the toxicology reports, the Court of Appeal found Rachel O.'s interview during the S.A.R.T. exam, wherein she discloses the prescriptions she is on, was sufficient to notify Petitioner of the drugs. (*Id*. at 24.) Additionally, Rachel O. testified upon being recalled about these prescription drugs. (*Id*.) For all of these reasons, the Court of Appeal found Petitioner's argument meritless. (*Id*. at 25-26.)

       1. *Governing law*

The United States Supreme Court held in *Brady* "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87. To show a *Brady* violation, a party must show the three prong test has been satisfied: the evidence must be favorable to the accused, suppressed by the State, and prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999). Exculpatory or impeaching evidence is considered favorable under the *Brady* test. *Id*. The state may suppress evidence either wilfully or inadvertently. *Id*. If this evidence is "material to the outcome such that the defendant was prejudiced by the suppression," the third prong is satisfied. *Id*.

Here, Respondent does not contest the first prong of *Brady* has been fulfilled. (Doc. 39-1 at 22.) Respondent notes the Court of Appeal also assumed the second prong was fulfilled for purposes of its analysis, and accordingly submits. (*Id*.) The third prong of the *Brady* claim requiring prejudice is where Respondent argues Petitioner's claim falls short. (*Id*. at 16.)

//

18

Evidence is deemed material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability," in turn, "is a probability sufficient to undermine confidence in the outcome." *Id.* "A 'reasonable probability' does not require showing by a preponderance that the outcome would have been different." *Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir. 1997) (en banc) (citing *Kyles v. Whitley*, 514 U.S. 419, 433-35 (1995)). In other words, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

The Ninth Circuit has held that "[i]mpeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case." *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005). "In cases in which the witness is central to the prosecution's case, the defendant's conviction indicates that in all likelihood the impeachment evidence introduced at trial was insufficient to persuade a jury that the witness lacked credibility." *Benn v. Lambert*, 283 F.3d 1040, 1055 (9th Cir. 2002) (holding that *Brady* material is especially likely to be prejudicial if it "would have provided the defense with a new and different ground of impeachment").

In *Price*, appellee was convicted of being a felon in possession of a firearm. The conviction, however, was mainly won because of a prosecution witness who testified she had seen Price in possession of the firearm shortly before being apprehended by police. During trial, Price's counsel impeached the witness as best as possible by attacking her memory and perception; however, this impeachment fell short and Price was convicted. After trial, Price discovered the witness had a criminal history including crimes involving deceit. This information had not been turned over to Price by the prosecution. The court there found that "had Price been able to discredit [the witness]'s testimony, there is a reasonable probability that he could have persuaded a jury that there was reasonable

doubt" as to whether the gun was actually his, which was his defense. (*Id.* at 914.) Because the impeachment evidence was so strong and gave rise to a reasonable probability the jury would have found differently than it did at trial, the court reversed the decision on Price's motion for a new trial and remanded. (*Id.*)

When a jury seemingly has relied on a witness's testimony to reach its verdict, notwithstanding any impeachment evidence introduced at trial, and there is a reasonable probability the combination of presented and suppressed impeachment evidence would have altered the jury's perception of the witness's credibility, "the suppressed impeachment evidence is prejudicial." *Benn*, 283 F.3d at 1055. However "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-110 (1976).

"The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Barker v. Fleming*, 423 F.3d 1085, 1099 (9th Cir. 2005) (quoting *United States v. Croft*, 124 F.3d 1109, 1124 (9th Cir. 1997)). "For purposes of determining prejudice," therefore, "the withheld evidence must be analyzed 'in the context of the entire record.'" *Benn*, 283 F.3d at 1053 (quoting *Agurs*, 427 U.S. at 112).

### 2. *Application*

Here, Petitioner argues the toxicology report was invaluable impeachment evidence defense counsel would have used to impeach Rachel O., the prosecution's star witness. As such, the toxicology report was undoubtedly material. The parties do not dispute that while the jury did hear testimony about the blood test done to determine Rachel O.'s blood alcohol levels the night of the incident, the jury did not hear any evidence about the blood test done to determine the presence of narcotics. (Lodgment 1 at 13 fn.10.) Instead, the jury heard Bawardi's testimony that no such tests on Rachel O.'s blood sample had been performed. (Lodgment 15 at 1467.)

As Petitioner points out, following the jury's not hearing the evidence of the blood test results for narcotics, the jury was also unable to hear any subsequent expert testimony on the alleged additive effects of these narcotic drugs. This combination of evidence, according to Petitioner, would have been significantly impactful and persuasive in impeaching Rachel O.'s testimony. Petitioner argues had he been aware of this suppressed blood test, he would have been able to run his own tests on the blood, test for a broader array of narcotics, and present expert testimony regarding the blood test results and the additive effects thereof.

While Petitioner claims if he had been in possession of the toxicology report and been able to impeach Rachel O.'s testimony through cross-examination and the presentation of expert witnesses to testify as to the additive effects of her prescriptions, this does not show a reasonable probability the jury would not have still found Petitioner guilty of all charges. Most telling is the jury returning the verdict less than 90 minutes after being sworn in and beginning deliberations. *See Tri Dung Nguyen v. Felker*, 2009 U.S. Dist. LEXIS 45034 ("The quick deliberations in this case show that it was not a close case"); *United States v. Lopez*, 500 F.3d 840, 846 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 950 (2008) (finding the same "because lengthy deliberations suggest a difficult case").

As the Court of Appeal noted, "For there to have been a more favorable result for [Petitioner], the jury would have had to find that Rachel [O.] was lying when she testified that [Petitioner] committed a series of forcible sex offenses against her at knifepoint." (Lodgment 1 at 13.) This was unlikely to occur because there was a considerable amount of strong evidence showing Petitioner's guilt. Such evidence includes testimony concerning Petitioner's aggressive behavior and his angry display of a knife during the Saturday afternoon of the overnighter, physical and eyewitness evidence demonstrating sexual contact between Petitioner and Rachel O., Rachel O.'s injuries, Rachel O.'s immediate disclosure of the offenses, propensity evidence of Petitioner's commission of other sexual offenses, and Petitioner's flight and arrest at the international border.

Frankly, no aspect of the suppressed toxicology tests "undermine[] confidence in the outcome of the trial." *Dyson v. Dormire*, 2009 U.S. Dist. LEXIS 90211, *31.

Furthermore, even if Rachel O.'s testimony was successfully impeached by defense counsel's use of the suppressed toxicology report, there is not a reasonable probability the jury would have found Petitioner did not commit the crimes against Rachel O. Contrarily, the remaining evidence would likely be enough for the jury to still reach the same guilty verdict. Thus, this Court remains confident the outcome would remain the same, and therefore habeas relief is DENIED. *Id.*

## B. *Prosecutorial misconduct*

Petitioner next argues the Prosecution committed multiple instances of prosecutorial misconduct, which denied him a fair trial. (Doc. 29 at 60. Doc. 32 at 6.) Petitioner first raises the issue in his FAP, alleging prosecutorial misconduct occurred when the Prosecution did not halt Bawardi's testimony. (Doc. 29 at 61.) Bawardi testified Bio-Tox Laboratories had never received Rachel O.'s blood sample, which resulted in the lack of testing completed on the sample. (Lodgment 15 at 1467.) This was incorrect. In reality, Bio-Tox Laboratories had received the sample and Bawardi was in fact one of two toxicologists who ran the testing on the blood sample completed before trial. (Doc. 29 at 107-08.) In light of this glaring discrepancy, Petitioner argues the Prosecution incorrectly allowed Bawardi to perjure herself and did not take steps to cure this alleged perjury. This violated Petitioner's right to a fair trial because Bawardi's testimony misled the court and the jury. (*Id.* at 61.)

In Petitioner's supplement to his FAP, (Doc. 32), Petitioner again advances the issue of prosecutorial misconduct; however, Petitioner does so in the context of an ineffective assistance of counsel claim.[9] (*Id.* at 6.) In his supplement, Petitioner argues in

---

[9] Petitioner argues his appellate counsel was ineffective for not raising prosecutorial misconduct on direct appeal. This Court addresses the foundation of the ineffective assistance claim here because if Petitioner cannot show prosecutorial misconduct is a valid claim, his ineffective assistance claim against appellate counsel for failing to raise the issue will similarly fail.

addition to allowing Bawardi to perjure herself, the Prosecution also committed misconduct by allowing Rachel O.'s husband, Kevin O., to perjure himself; by making false statements to the trial court regarding the status of the Luz P. case; and by making "disparaging" remarks about defense counsel during closing arguments. (*Id*. at 12, 16, 18.)

Petitioner claims Kevin O. committed perjury at two points during his testimony. First, Petitioner contends Kevin O. gave false testimony when Kevin O. stated once he arrived at the hospital the night of the Rachel O. incident, he observed Rachel O.'s clothes were torn. (Doc. 32 at 12.) At trial, defense counsel pointed out that none of Rachel O.'s clothes were in fact torn or otherwise manipulated, except for the area taken for testing by the criminologist. (*Id*.) Other than this cut square, Rachel O.'s clothes were intact. Second, Petitioner contends Kevin O. perjured himself by testifying he turned left when departing the overnighter to look for Rachel O. and Petitioner. (*Id*.) Topography maps authenticated by subsequent witnesses showed there was no left turn Kevin O. could have taken when leaving the overnighter. (*Id*.) Petitioner argues the Prosecution was aware both of Kevin O.'s statements were untrue when they were made; however, the Prosecution neither stopped nor corrected the false testimony at that time or later. (*Id*. at 14.) Petitioner also claims the Prosecution, by allowing Kevin O.'s testimony to stand, despite knowing of its false nature, denied Petitioner the right to a fair trial.

Third, Petitioner argues the Prosecution committed misconduct during the pretrial motion *in limine* hearings when the Prosecution was arguing its motion *in limine* to exclude the status of the Luz P. case. Defense counsel argued to inform the jury that the Luz P. case had never been pursued or prosecuted. (Lodgment 15 at 59.) Instead, the charges filed against Petitioner in that case were dropped three days after Petitioner was arrested without ever being filed with the court. (*Id*. at 16.) During this argument, however, the Prosecution represented to the trial court that the Luz P. case was "pending." (*Id*. at 16.) Petitioner argues this representation to the trial court led the trial

//

court to allow the propensity evidence because the Prosecution "stating the case 'is pending' gave credibility to a case that would not proceed to trial."[10] (*Id.*)

Finally, Petitioner argues the Prosecution made "disparaging" remarks towards defense counsel during closing arguments. In the Prosecution's closing argument, the Prosecution addressed the defense position that the scratches on Rachel O.'s arms were self-inflicted. (Lodgment 15 at 1735, "You've got to be kidding me, you've got to be kidding me.") Petitioner claims these remarks are evidence of the Prosecution taking advantage of her stature as "a pillar of truth" in order to affirm the notion of the defense counsel as a "manipulator[] of truth." (Doc. 32 at 18.)

In sum, because the trial was "riddled with multiple instances of prosecutorial misconduct," the Petitioner argues there was a pattern of misconduct throughout the trial depriving Petitioner of his right to a fair trial. (*Id.* at 22-23.) Petitioner contends this deprivation warrants habeas relief.

Respondent counters these arguments in its answer to Petitioner's FAP and supplement. (Doc. 39.) The responses to these arguments are all couched in an ineffective assistance of counsel context.[11] Respondent argues Petitioner's claims of prosecutorial misconduct through allowing perjured testimony must satisfy the test set out in *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959). Under this test, Respondent argues Bawardi's false testimony was not material and Petitioner did not establish that the Prosecution knew this testimony was false and therefore needed to be corrected. (Doc. 39-1 at 41.) Stated another way, Respondent argues Petitioner's claim falls short of the *Napue* test.

---

[10] Petitioner does not seem to be arguing the trial court's denial of the Prosecution's motion *in limine* was incorrect, but rather that this statement by the Prosecution is another example of the prosecutorial misconduct evident throughout Petitioner's trial.

[11] As noted above in footnote 6, the prosecutorial misconduct allegations and the parties' respective arguments are all discussed in this section, despite the parties overlapping presentation of the issues as prosecutorial misconduct and ineffective assistance of counsel for failure to raise prosecutorial misconduct on direct appeal.

Responding to the allegation of prosecutorial misconduct resulting from the Prosecution's statement that the Luz P. case was pending, Respondent argues the Prosecution did not misrepresent the status of the Luz P. case to the trial court. (Doc. 39-1 at 44.) Further, Respondent contends even if the Prosecution was mistaken about the status, the statement that the case was pending did not cause the trial court to change its position on the motion *in limine* being argued. (*Id*. *See* Lodgment 15 at 59-60.)

Finally, Respondent refutes Petitioner's claims of prosecutorial misconduct regarding the "disparaging" statements made during closing arguments on three grounds. First, defense counsel did not object to the statements at the time they were made, thus failing to preserve a prosecutorial misconduct claim on appeal. (Doc. 39-1 at 45.) Second, the Prosecution merely used "colorful language" to criticize the defense position about how the scratches on Rachel O.'s arms came to be. (*Id*.) Third and finally, regardless of the Prosecution's remarks, the evidence against Petitioner for the crimes committed against Rachel O. could not have been outweighed by any prejudice caused by these statements. (*Id*.)

### 1. Governing Law

The appropriate standard of review in federal habeas corpus for prosecutorial misconduct is the narrow one of due process and not the broad exercise of supervisory power. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated only when a prosecutor's misconduct renders a trial "fundamentally unfair." *Id*.; *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) (stating that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Claims of prosecutorial misconduct where a proper objection was lodged at trial are reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir.) (citation omitted), *cert. denied*, 516 U.S. 1017 (1995).

On the other hand, under California law, claims of prosecutorial misconduct must be objected to at trial in order to be preserved on appeal. *See People v. Fosselman*, 33 Cal. 3d 572, 580-81 (1983). A petitioner who fails to observe a state's "contemporaneous objection" rules may not challenge the constitutionality of the conviction in federal court. *See Engle v. Isaac*, 456 U.S. 107, 129 (1982). *See also Rich v. Calderon*, 170 F.3d 1236, 1241 (9th Cir.1999) (stating that California enforces the contemporaneous objection rule during trial argument), *amended*, No. 97-99007, slip op. 9143, 9147-49 (9th Cir. Aug. 13, 1999). The one exception to this rule occurs when a petitioner can show there was "cause" for the failure to raise the objection at trial and the failure to object caused "prejudice." *See Engle*, 456 U.S. at 129 ("When a procedural default bars state litigation of a constitutional claim, a state prisoner may not obtain federal habeas relief absent a showing of cause and actual prejudice").

Under the procedural bar doctrine, "a federal court ordinarily will not review a state court ruling if the state court would find that the claim was barred pursuant to an independent and adequate state procedural rule." *Robinson v. Schriro*, 595 F.3d 1086, 1100 (9th Cir. 2010). A procedural rule is adequate if the rule is "clear, consistently applied, and well-established at the time of the petitioner's purported default." *Lee v. Jacquez*, 788 F.3d 1124, 1128 (9th Cir. 2015) (quotations and citations omitted); *see Walker v. Martin*, 562 U.S. 307, 316 (2011) (describing adequacy prong as requiring the rule be "firmly established and regularly followed").

This rule of forfeiture is an independent and adequate basis for dismissing a claim, and it is well settled that California "consistently applies its contemporaneous objection rule[.]" *Fairbank v. Ayers*, 650 F.3d 1243, 1256 (9th Cir. 2011) (citing *Garrison v. McCarthy*, 653 F.2d 374, 377 (9th Cir. 1981)); *see also Zapien v. Martel*, 805 F.3d 862, 868 n.2 (9th Cir. 2015) (California court's finding that claim was procedurally barred, because petitioner did not contemporaneously object at trial, is a "an independent and adequate basis for dismissing the claim, which we are barred from reviewing"); *Sands v. Lewis*, 511 Fed. Appx. 608, 610 (9th Cir. 2013) (concluding "claim of prosecutorial

misconduct is . . . procedurally defaulted under California's contemporaneous objection rule," because "counsel failed to register a timely objection to the offensive remarks"). Accordingly, the procedural default bar applies to Petitioner's claim of prosecutorial misconduct unless Petitioner has established that he qualifies for an exception.

Courts must excuse a procedural default if the petitioner can show "cause for the default and actual prejudice as a result of the alleged violation of federal law," *see Coleman*, 501 U.S. at 750, a fundamental miscarriage of justice, *see Murray v. Carrier*, 477 U.S. 478, 495 (1986), or if the government waived the procedural default, *see Franklin v. Johnson*, 290 F.3d 1223, 1230, 1233 (9th Cir. 2002). In order to constitute cause, a showing that the factual or legal basis for a claim was not reasonably available to counsel, or some interference by officials made compliance impracticable will suffice. *Id*. at 488 (citing *Reed v. Ross*, 468 U.S. 1, 16 (1984); *Brown v. Allen*, 344 U.S. 443, 486 (1953)). Generally, though, if "the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule[,]" cause will be shown. *Id*.

2. *Application*

Petitioner clearly believes his case falls within one of the three categories requiring the Court to excuse the procedural default. However, Petitioner did not explicitly argue he could show cause and prejudice nor a fundamental miscarriage of justice. Respondent likewise did not waive the procedural default. In fact, the Respondent relies upon the procedural default as one reason to deny the Petitioner's claim of prosecutorial misconduct. Nonetheless, because Petitioner filed his FAP and the supplement thereto *pro se*, this Court may interpret Petitioner's arguments less stringently. *Zichko v. Idaho*, 247 F.3d 1015 (9th Cir. 2001).

In support of his position the procedural default should be excused, Petitioner admits defense counsel did not object to any of the alleged instances of prosecutorial misconduct. But, Petitioner contends the more important fact is that defense counsel "did object to the most visible and serious instances of misconduct," referring to the alleged

*Brady* violation and defense counsel's consequent motion for mistrial based thereon. (Doc. 32 at 22.) Petitioner argues this Court can and should overlook the preservation issue because where the trial court did not find the Prosecution had committed a *Brady* violation by suppressing the toxicology reports, other objections to less flagrant misconduct would have been "futile." (*Id.*)

Similarly, before Petitioner's trial began, during the hearing on the motions *in limine*, the trial court heard defense counsel's argument on the motion to sever the newly consolidated cases involving charges for the incident with Rachel O. and one charge for the incident with Ashley H. (Lodgment 15 at 52-53.) The trial court denied defense counsel's motion to sever.

Neither the trial court's denial of the motion for mistrial based on the *Brady* violation nor the trial court's denial of the motion to sever evidence defense counsel's reluctance to object to other perceived instances of misconduct. Despite these adverse rulings made by the trial court, the trial court was not a sufficient "factor external to the defense" causing defense counsel to not lodge the proper objections. *Reed*, 468 U.S. at 16; *Brown*, 344 U.S. at 486. Thus, Petitioner has not presented adequate facts to show defense counsel had cause to not lodge objections to the various allegations of prosecutorial misconduct.

Ineffective assistance of counsel may also provide sufficient cause to overcome a procedural default, so long as the assistance was constitutionally ineffective. *Price v. Ryan*, 2015 U.S. Dist. LEXIS 175481 (citing *Ortiz v. Stewart*, 149 F.3d 923, 932 (9th Cir. 1998)). While Petitioner does argue he received ineffective assistance of defense counsel, Petitioner does not argue his defense counsel was ineffective in failing to lodge the necessary objections to the alleged prosecutorial misconduct. Thus, Petitioner's prosecutorial misconduct claims are procedurally barred, and habeas relief is DENIED on this ground.

//

//

## C. *Ineffective assistance of counsel*

### 1. *Governing Law*

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Williams v. Taylor*, 120 S. Ct. 1495, 1512 (U.S. 2000) (stating it is beyond question that *Strickland* is the "clearly established" law governing ineffective assistance of counsel claims); *Baylor v. Estelle*, 94 F.3d 1321, 1323 (9th Cir. 1996) (same); *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997) (same). There, the United States Supreme Court establish a two-part test for evaluating ineffective assistance of counsel claims. To establish that his trial counsel was ineffective under *Strickland*, a challenger must show: (1) his trial counsel's performance was deficient; and (2) trial counsel's deficient performance prejudiced his defense. Ortiz, 149 F.3d at 932 (citing *Strickland*, 466 U.S. at 688, 694).

To establish deficient performance, Petitioner must show that "counsel made errors so serious . . . that counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. The relevant inquiry is not, however, what counsel could have done, but rather whether the decisions made by counsel were reasonable. *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). In considering this factor, counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690. The Ninth Circuit "h[as] explained that '[r]eview of counsel's performance is highly deferential and there is a strong presumption that counsel's conduct fell within the wide range of reasonable representation.'" *Ortiz*, 149 F.3d at 932 (quoting *Hensley v. Crist*, 67 F.3d 181, 184 (9th Cir. 1995)). "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review of highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365,

//

381 (1986). Additionally, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

It is well settled that "[c]onclusory allegations [of ineffective assistance of counsel] which are not supported by a statement of specific facts do not warrant habeas relief." *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); *see also Strickland*, 466 U.S. at 690 (a petitioner "making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment"); *Ortiz*, 149 F.3d at 933 (rejecting ineffective assistance of counsel claim where petitioner failed "to indicate how he was prejudiced by counsel's failure . . ." to conduct cross-examination on a specific issue); *United States v. Berry*, 814 F.2d 1406 (9th Cir. 1987) (defendant was not denied effective assistance of counsel for failure to call out-of-state witnesses absent indication of what witnesses would have testified to or how their testimony would have changed the outcome of proceeding.); *Cranford v. Sumner*, 672 F.Supp. 453, 457 (D. Nev. 1987) ("Aside from the bald allegation that his attorney should have raised this claim but did not, the petitioner has failed to demonstrate how his attorney's performance fell below the reasonable level of professional competence required by Strickland").

It is well-established that a defendant has the ultimate authority to make fundamental decisions regarding whether to plead guilty, waive a jury trial, testify in his or her own behalf, or take an appeal. *Wainwright v. Sykes*, 433 U.S. 72, 93 n. 1 (1977) (Burger, C.J. concurring). However:

> [no decision of the Supreme Court] suggests, . . . the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points.

//

*Jones v. Barnes*, 463 U.S. 745, 751 (1983). To require otherwise would "seriously undermine[] the ability of counsel to present the client's case in accord with counsel's professional evaluation." *Id*. The professional judgment and evaluation every defendant is entitled to is an examination of the record, research of the law, and the marshaling of arguments on behalf of the defendant. *Douglas v. California*, 372 U.S. 353, 358 (1963).

Additionally, under the AEDPA, the federal court's review of the state court's decision is subject to another level of deference. *Bell*, 535 U.S. at 689-699. In order to merit habeas relief, therefore, Petitioner must make the additional showing that the state court's ruling that counsel was not ineffective constituted an unreasonable application of *Strickland*. 28 U.S.C. § 2254(d)(1); *West v. Schriro*, 2007 U.S. Dist. LEXIS 90802 (D.Ariz. Nov. 29, 2007).

The Ninth Circuit has held that a convicted defendant has no Sixth Amendment rights on appeal because appellate review is not required of states. "If, however, the State elects to furnish an avenue for appeal, its procedures must comport with the Due Process and Equal Protections Clauses of the Fourteenth Amendment." *Tamalini v. Stewart*, 249 F.3d 895 (9th Cir. 2001).

2. *Appellate Counsel*

Petitioner argues he received constitutionally ineffective assistance of counsel from his appellate counsel, who declined to raise prosecutorial misconduct on appeal. (Doc. 32 at 6-23.) The Court of Appeal rejected this because Petitioner did not provide a declaration from appellate counsel to support the claim. (Doc. 39-1 at 40.) Subsequently, Petitioner obtained a sworn letter from appellate counsel wherein appellate counsel stated he had not raised the issue of prosecutorial misconduct because he "simply did not identify prosecutorial misconduct as a potential separate issue." (Doc. 32 at 47.)

Respondent maintains this issue is not sufficient to grant habeas relief because "[a]ppellate counsel's letter does not establish that he provided ineffective assistance." (Doc. 39-1 at 40.) Ultimately, Respondent raises the arguments rebutting Petitioner's ineffective assistance of appellate counsel claims as discussed in the preceding section.

While Petitioner goes to great lengths to show his appellate counsel was ineffective for not arguing prosecutorial misconduct during Petitioner's direct appeal, (*see* Doc. 32 at 6-23), as discussed above, the claim was not meritorious because defense counsel failed to lodge the appropriate objections at trial.[12] Thus, even if Petitioner's appellate counsel's actions fell short of the highly deferential standard of deficient performance, in this case, appellate counsel's actions did not prejudice Petitioner's appeal because the claim was procedurally defaulted before appellate counsel could have raised it. "The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel." *Baumann v. United States*, 692 F.2d 565, 572 (9th Cir. 1982). Therefore, habeas relief is DENIED on this ground.

### 3. *Trial counsel*

Although Petitioner does not argue he received ineffective assistance of defense counsel in regard to the alleged prosecutorial misconduct, Petitioner claims defense counsel was ineffective by failing to investigate and test available evidence, failing to subpoena an alibi witness and an exculpatory witness, and failing to effectively prepare for trial. (Doc. 32 at 24-33.)

Respondent counters by citing the Court of Appeal's denial of Petitioner's claim for ineffective assistance of trial counsel as untimely. (Doc. 39-1 at 31.) The Court of Appeal expressly noted Petitioner's claims for ineffective assistance of trial counsel were filed more than three and a half years after Petitioner was sentenced and nearly two years after the judgment was affirmed on appeal "without any explanation for the delay." (Lodgment 8 at 2.) The Court of Appeal accordingly denied the claims as untimely. The Court of Appeal continued in its ruling to also discuss the merits of both Petitioner's ineffective assistance claims, and held even if Petitioner's ineffective assistance of counsel claims were not procedurally barred, they would be substantively denied on other

---

[12] While Petitioner's appellate counsel may not have raised an ineffective assistance of counsel claim for defense counsel's failure to lodge these objections, Petitioner does not make this argument.

grounds. (*Id*. at 2-3.) Petitioner did not submit any supporting evidence regarding his claim of ineffective assistance of counsel; no declarations, trial transcripts; or other evidence establishing any of Petitioner's claims are valid were submitted to the Court of Appeal. (Id. at 2.) Instead, the Court of Appeal holds even if Petitioner's claims were not procedurally barred, Petitioner's conclusory allegations are "insufficient to sustain [Petitioner's] heavy pleading burden." (*Id*. at 3.)

a. Failure to investigate and test available evidence

Petitioner first contends defense counsel performed deficiently in failing to discover and test available evidence. (Doc. 32 at 24.) During trial, defense counsel presented a theory that Rachel O.'s only injury, the scratches on her arms, were self-inflicted instead of caused by Petitioner dragging Rachel O. through gravel, as the Prosecution argued. (See Lodgment 15 at 221-222, 1688-89.) Defense counsel pursued a line of questioning regarding these injuries and the accompanying theory while cross examining Rachel O. Petitioner argues that while defense counsel had this thought process and embarked upon this line of questioning during the trial, defense counsel failed to test the scrapings taken from Rachel O.'s fingernails during the S.A.R.T. exam. These scrapings, Petitioner contends, would have been able to either prove or disprove the defense theory because they would either show Rachel O.'s own DNA or dirt from the scene under her fingernails. By failing to acquire and test these scrapings, Petitioner argues defense counsel performed deficiently.

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. This includes a duty to investigate the defendant's "most important defense," Sanders, 21 F.3d at 1457, and a duty to adequately investigate and introduce into evidence records that demonstrate factual innocence or raise sufficient doubt on that question to undermine confidence in the verdict. *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999). When the record clearly shows that the lawyer was well-informed, and the petitioner fails to state what additional information would be gained by the discovery

he now claims was necessary, an ineffective assistance claim fails. *Id*. Furthermore, "ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case." *Id*.

Failure to investigate a possible defense may form the basis of a claim of ineffective assistance of counsel; however, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 690-91. Trial counsel's decision not to pursue an unproductive or unfruitful defense may be a reasonable strategic decision. *Bonin*, 59 F.3d at 833-35.

To determine whether prejudice resulted from the failure to investigate and present evidence, the evidence that was actually presented to the jury must be compared to the evidence that might have been presented had counsel pursued the investigation. *Id*. at 834. Only if there is a reasonable probability that the presentation of such evidence would have resulted in a different verdict will the failure to investigate warrant relief under the *Strickland* standards. *Id*. at 836.

Here, defense counsel presented the defense theory that Rachel O.'s injuries were self-inflicted instead of caused by Petitioner. However, defense counsel's presentation of this theory was merely through cross-examination of Rachel O., and the theory was presented with only one remark. (Lodgment 15 at 272-73, "There are some scratches or red marks on your forearms that to me could also be consistent with somebody, like, scratching themselves nervously or something of that nature.") Beyond this mere statement and question whether self-inflicted scratching could have been the cause of Rachel O.'s injuries, defense counsel did not provide any other evidence of the theory and only briefly raised it in his closing argument. (*Id*. at 1724.)

Further, during Devlin's cross-examination, defense counsel confirmed the existence of the scrapings taken from Rachel O.'s fingernails. (Lodgment 15 at 567.) These scrapings, according to Petitioner, should have been further investigated and tested to either prove or disprove defense counsel's theory about the cause of Rachel O.'s

scratches. (Doc. 32 at 25.) Petitioner argues again that Rachel O.'s credibility was of paramount importance to the Prosecution's case, and so if "this evidence can show Rachel O. injured herself to manufacture the appearance of a crime," defense counsel's failure to investigate this evidence amounts to ineffective assistance of counsel. (Doc. 32 at 25.)

Petitioner must then establish this failure to investigate prejudiced his defense. In doing so, Petitioner must show there is a reasonable probability the presentation of this alternative evidence that may have been discovered would have changed the verdict. The evidence Petitioner argues may have been discovered through the investigation defense counsel omitted is the scrapings proving Rachel O.'s scratches, which are her only injury, were self-inflicted. Specifically, if the scrapings could prove Rachel O.'s only injuries were in fact not caused by Petitioner, Rachel O.'s credibility would have been diminished. (Doc. 32 at 25.)

Although Rachel O.'s case did depend heavily upon her credibility, merely presenting these scrapings and the potential that Rachel O.'s scratches were self-inflicted would not likely have changed the verdict. Despite Petitioner's contention that the scrapings would show Rachel O.'s own DNA under her fingernails, Petitioner neglects to address the equally likely possibility the testing would show gravel from the scene. Based on the very real possibility the evidence could be unfavorable to Petitioner, defense counsel was not outside the scope of professional norms in not testing the evidence. Additionally, Petitioner filed a post-appeal motion to test the evidence, but did not present any results of such testing. Without these results showing the evidence was favorable, Petitioner has not shown defense counsel's failure to test the evidence prejudiced Petitioner's defense. Thus, Petitioner's ineffective assistance of counsel claim accordingly fails in this respect and habeas relief is DENIED.

### b. Failure to subpoena alibi witnesses

Petitioner next argues he received ineffective assistance of counsel when defense counsel failed to subpoena suggested witnesses Shannon Lemoureux and Geoffrey Perry.

(Doc. 32 at 27.) Attached to Petitioner's FAP are notes from the Public Defender Investigator's separate interviews with these two witnesses. (*Id.* at 45-46.) Lemoureux stated in her interview that she was with Petitioner the night of the Ashley H. incident in 2008. (*Id.* at 45.) Contrary to Ashley H.'s testimony that the assault by Petitioner occurred after midnight, Lemoureux stated she, Petitioner, and another Grifters member who she was dating at the time, left the party together around midnight and rode back to the San Diego area. Petitioner contends Lamoureaux would have presented credible evidence of Petitioner's alibi for the Ashley H. charge.

Perry was interviewed as a witness to the 2010 Luz P. incident in Arizona. Perry was present the night of the incident and saw Petitioner and Luz P. walking and holding hands before Luz P.'s friends arrived. During the interview, Perry stated when he and another Laughing Devils prospect came upon Petitioner and Luz P., "[Luz P.] was clearly holding on to [*sic*] [Petitioner]'s hand and was very close to him. . . . She did not appear concerned for her safety and did not say or express that anything was abnormal in regards [*sic*] to her friendship with [Petitioner]." (*Id.* at 46.) Additionally, Perry noted Luz P. was "giggling and laughing with [Petitioner] and seemed pretty happy to be with him." (*Id.*)

The failure to call a witness cannot establish ineffective assistance when defense counsel is well-informed of the facts and circumstances of the witness's account. *Eggleston v. U.S.*, 798 F.2d 374, 376 (9th Cir. 1986). Trial counsel's tactical decisions deserve deference when counsel makes an informed decision based on strategic trial considerations, and the decision appears reasonable under the circumstances. *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). The ultimate decision not to call witnesses at trial is well within counsel's "full authority to manage the conduct of the trial." *Taylor v. Illinois*, 484 U.S. 400, 418 (1988) ("Putting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the lawyer's decision . . . to decide not to put certain witnesses on the stand . . . .").

To establish prejudice caused by the failure to call a witness, Petitioner must show the witness was likely to have testified if called; the witness would have given the

proffered testimony; and the witness's testimony would have created a reasonable probability that the jury would have reached a verdict more favorable to Petitioner. *See Alcala v. Woodford*, 334 F.3d 862, 872-73 (9th Cir. 2003); *United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987) (the prejudice prong of an ineffective assistance claim was not satisfied because no indication of what potential witnesses would have testified to or how their testimony might have changed the outcome of the hearing was offered).

While Petitioner has not necessarily shown the uncalled alibi witnesses would have testified had they been subpoenaed, Petitioner's claim for ineffective assistance of counsel regarding these witnesses fails for other reasons. *See United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (claim of ineffective assistance based on failure to call witnesses requires, at minimum, evidence that those uncalled witnesses in fact have testified). Ultimately, there are valid reasons defense counsel may have chosen to not subpoena either Lamoureux or Perry.

For example, Lamoureux, according to her witness interview summary, had trouble recalling the exact events of the night in question, but did state she, the other Grifter, and Petitioner left the party around midnight. Most importantly, though, Lamoureux thoroughly discussed her disdain for Petitioner during her interview. Lamoureux described Petitioner as "shady," "sneaky," and a liar. She further described her discomfort when she was around Petitioner and stated "some of the other women who hang out with the motorcycle club avoid [Petitioner] because of his demeanor." Finally, Lamoureux stated Petitioner gave her "the creeps." The combination of Lamoureux's inability to remember details of the night and her negative feelings towards Petitioner may have led defense counsel to conclude Lamoureux would be a more detrimental witness than beneficial. This decision therefore was not arbitrary but instead was strategic.

Regarding Perry, Petitioner argues Perry's testimony would have been valuable at trial to corroborate Andrew Ritz's testimony about seeing Luz P. and Petitioner together the night of that incident. (Doc. 32 at 28. *See also* Lodgment 15 at 1530.) Perry's witness

statement and proffered testimony taken therefrom is virtually identical to Ritz's in that they both describe Luz P. and the Petitioner walking hand in hand, laughing, and presenting nothing leading the men to believe Luz P. was averse to her situation. (Doc. 32 at 46, Lodgment 15 at 1538-39.) Given the similarities in the testimony of Ritz and the interview of Perry, defense counsel could have decided presenting two witnesses giving identical testimony to dispute propensity evidence only may be found cumulative and burdensome by the jury. This decision therefore was also sufficiently strategic so as to avoid being rendered outside professional norms.

Ultimately, because defense counsel's omission of Lamoureux and Perry's testimony was not outside the bounds of professional representation, Petitioner's claim for ineffective assistance of trial counsel in this regard must also fail. Accordingly, habeas relief on this ground is DENIED.

### c. Failure to prepare effectively for trial

Lastly, Petitioner contends he received ineffective assistance of counsel because defense counsel failed to effectively prepare for trial. (Doc. 32 at 29.) Petitioner argues defense counsel was ineffective because he met with Petitioner only three times before Petitioner's trial. (*Id*.) These meetings were reportedly regarding the Rachel O. charges, the possible sentence if trial was lost, and the newly added kidnapping charges, respectively. (*Id*.) From the time of the last meeting to Petitioner's trial, the Ashley H. charge was consolidated with the Rachel O. charges. (*Id*.) During these meetings, Petitioner states no strategy or witnesses were discussed. (*Id*.) Instead, defense counsel waited until trial to speak with Petitioner about this. (*Id*. at 29-30.) Each day of trial, Petitioner would speak with defense counsel for about 15 minutes before entering the courtroom. (*Id*. at 30.) Petitioner argues these communications were insufficient, and forced Petitioner to "attempt[] to inform defense counsel of witnesses as they walked to the witness stand." (*Id*. at 30.)

Adequate consultation between attorney and client is an essential element of competent representation of a criminal defendant. *Coles v. Peyton*, 389 F.2d 224, 225-26

(4th Cir.1968), *cert. denied*, 393 U.S. 849 (1968); *see also Adams v. Balkcom*, 688 F.2d 734, 738 (11th Cir.1982); *United States v. Porterfield*, 624 F.2d at 124. While the amount of consultation required will depend on the facts of each case, the consultation should be sufficient to determine all legally relevant information known to the defendant.

In arguing this, Petitioner does not state how defense counsel's representation of Petitioner would have differed had defense counsel met with Petitioner more often. Instead, Petitioner generally argues defense counsel was "lackadaisical" in preparing Petitioner's case, neglecting to conduct a separate investigation and relying solely on evidence produced by the Prosecution. (Doc. 32 at 30.) Thus, even if defense counsel's preparations of Petitioner's trial were deficient under *Strickland*, Petitioner has not shown his defense was prejudiced by such inactions. Accordingly, Petitioner's claim for ineffective assistance of counsel and habeas relief based thereon is DENIED.

**4. *Motion to sever the Ashley H. count from the Rachel O. counts***

Petitioner makes a final argument that he was denied the right to a fair trial because the trial court denied his motion to sever the Ashley H. count from the Rachel O. counts. (Doc. 29 at 70.) Petitioner argues the trial court erred because there was no cross admissibility between the charges, Ashley H. had significantly weaker evidence, and Petitioner probably would have testified had he been tried for the Ashley H. charge separately. (*Id*. at 70-71.) In summarizing his argument, Petitioner notes "[d]espite the dramatically favorable court findings in petitioner's favor on crucial facts," in addition to the other reasons laid out in the preceding sentence, the trial court erroneously denied Petitioner's severance motion and subsequent motion for new trial based on this denial. (*Id*. at 71.)

Respondent counters this argument by noting the United States Supreme Court has never held the denial of a motion to sever charges violates due process rights. (Doc. 39-1 at 24.) Because of this, Respondent argues the Court of Appeal was correct in finding Petitioner has no habeas relief for this claim because the trial court's decision "could not //

39

have been contrary to, nor an unreasonable application of, Supreme Court precedent." (*Id.*) *See also* 28 U.S.C. § 2254(a).

California Penal Code section 954 states "[a]n accusatory pleading may charge two or more different offenses connected together in their commission, or . . . two or more different offenses of the same class of crimes or offenses, under separate counts . . . ." Joinder of counts is favored because it promotes efficiency. *People v. Myles*, 274 P.3d 413 (Cal. 2012). Here, Petitioner was charged and convicted of those charges resulting from two separate instances of sexual offenses.

"The Supreme Court has never held that a trial court's failure to provide separate trials on different charges implicates a defendant's right to due process." *Collins v. Uribe*, No. 11-56297, 564 Fed. Appx. 343 (9th Cir. 2014) citing *Collins v. Runnels*, 603 F.3d 1127, 1132 (9th Cir. 2010); *see also Martinez v. Yates*, 585 Fed. Appx. 460, 2014 WL 5293673 (9th Cir. 2014); *Runningeagle v. Ryan*, 686 F.3d 758, 774 (9th Cir. 2012). Although the Supreme Court has never directly addressed the question, the Ninth Circuit has stated "[f]ederal habeas is available for improper consolidation only if the simultaneous trial 'actually render[ed the] state trial fundamentally unfair and hence, violative of due process.'" *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000) (quoting *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir.1991)). This Court must consider each count separately, asking whether "the trial on a particular count was fundamentally unfair in light of that count's joinder with one or more other charges." *Id*. The Ninth Circuit has held the failure of the jury to convict on all counts is "'the best evidence of the jury's ability to compartmentalize the evidence.'" *United States v. Baker*, 10 F.3d 1374, 1387 (9th Cir. 1993) (quoting *United States v. Unruh*, 855 F.2d 1363, 1374 (9th Cir. 1987)).

At trial, defense counsel's main argument against the consolidation of the charges regarding the two separate victims was that the Ashley H. count was "bootstrapped" to the Rachel O. counts. (Lodgment 15 at 53, "But as to the [Ashley H.] case it makes the case [that] probably isn't provable at all to where now because [the jury] is going to hear

[the Rachel O.] case it is.") Defense counsel essentially argued the Ashley H. case was so weak that on its own, the charge would not stand; but, by consolidating the charge with the Rachel O. charges, which were highly inflammatory, the jury would likely return a guilty verdict on the Ashley H. charge. (*Id*. "One case being so much more inflammatory in its nature of the evidence and being stronger in the nature of the proof point [than] the other case.")

The Ninth Circuit has recognized potential due process concerns when a poorly-supported charge is combined with one that is well supported. *Bean*, 163 F.3d at 1084; *Lewis*, 787 F.2d at 1322. Additionally, the Ninth Circuit has previously acknowledged that there is "a high risk of undue prejudice whenever . . . joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible." *Id*. In *Lewis*, the Court explained this risk by observing that "it is much more difficult for jurors to compartmentalize damaging information about one defendant derived from joined counts, than it is to compartmentalize evidence against separate defendants joined for trial," and by recognizing studies establishing "that joinder of counts tends to prejudice jurors' perceptions of the defendant and of the strength of the evidence on both sides of the case." *Id*. at 1322.

Here, Petitioner was accused of two separate sex offenses resulting in various charges, with evidence of one significantly outweighing evidence of the other. Despite cross-admissibility concerns raised by defense counsel, the charges were consolidated by the trial court at the Prosecution's request. The absence of cross-admissibility does not, by itself, demonstrate prejudice. *People v. Mendoza*, 6 P.3d 150 (2000); *see also* Cal. Pen. Code § 954.1.

Furthermore, both the Prosecution and trial court ensured Petitioner was not unfairly prejudiced by the consolidation of the Ashley H. and Rachel O. charges. The Prosecution in Petitioner's case did not blatantly link the charges regarding Ashley H. and Rachel O. in statements in such a way that prejudiced Petitioner to the extent

severance was necessary. *See Bean*, 163 F.3d at 1083 (where the prosecution asserted Bean was guilty of a second murder in a consolidated case which had very little evidence because "'the theft of [the second victim's] car and the manner in which [the murder] was perpetration suits [Bean']s style and his M.O., as you are well aware. . . ,'" this statement among other statements led the Ninth Circuit to find severance was required to ensure a fair trial). Instead, the Prosecution presented the evidence of the Ashley H. charge, consisting of testimony from Ashley H. herself, and the jury was allowed to find the evidence credible or not. (*See* Lodgment 15 at 735-792.)

The Prosecution made reference to Ashley H.'s credibility with evidence presented regarding the Rachel O. charges during Petitioner's trial. (*Id*. at 1675, "Can you believe Ashley H. more because you know that it happened to these other women? In other words, is her testimony corroborated then by what these other women said when they came in?"; *Id*. at 1734, "Doesn't Ashley H.'s testimony make sense in light of the women that you've heard from?") But there it ended. Suggesting a victim's testimony may be more credible based on corroborating statements made by other victims is not in itself proof severance was required.

In addition to the Prosecution acting appropriately during trial with respect to the boundaries between the consolidated cases, the trial court similarly acted appropriately so as to not prejudice Petitioner unfairly. No suggestions were made by the trial court to try the cases in concert, nor was there any encouragement to use evidence of one case to satisfy the other. *See Bean*, 163 F.3d at 1084 (where the trial court did not give instructions to the jury that emphasized the distinction between the consolidated cases, the Ninth Circuit found this was one factor making severance necessary). Although there was no jury instruction telling the jury to keep the evidence separated according to victim, this Court is confident that following the Prosecution's presentation, the jury was able to compartmentalize the evidence, and did not use the evidence from the Rachel O. counts to bolster the Ashley H. count. The Prosecution and trial court maintained the differentiation between the Rachel O. and Ashley H. charges throughout the trial, so that

the interplay that was present between the cases was not so substantial to be rise to the level of *Bean* and require a similar outcome.

Thus, because Petitioner did not suffer any undue prejudice as a result of this consolidation of charges and the trial court's denial of severance, Petitioner's trial on the Ashley H. count was not fundamentally unfair. Given the trial was not fundamentally unfair, habeas relief is DENIED on this ground.

## VI. CONCLUSION

This Report and Recommendation is submitted to the Honorable Cynthia Bashant, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c)(1)(c) of the United States District Court for the Southern District of California. For the reasons outlined above, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition for Writ of Habeas Corpus.

Any party may file written objections with the Court and serve a copy on all parties on or before **December 21, 2017**.  The document should be captioned "Objections to Report and Recommendation."  Any reply to the Objections shall be served and filed on or before **December 30, 2017**.  The parties are advised that failure to file objections within the specific time may waive the right to appeal the district court's order. *Ylst*, 951 F.2d at 1157 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:  December 8, 2017

Hon. Peter C. Lewis
United States Magistrate Judge

43